IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**RACHEL HOWELL,**

        Plaintiff,

vs.                                     No. CIV 10-1241 LFG/CG

**MICHAEL J. ASTRUE,**
**Commissioner of the**
**Social Security Administration,**

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

    **THIS MATTER** is before the Court on Plaintiff Rachel Howell's ("Howell") Motion to Reverse or Remand Administrative Agency Decision, filed November 28, 2011.  [Docs. 17, 18.] The Commissioner of Social Security issued a final decision denying benefits, finding that Howell was not disabled and not entitled to Supplemental Security Income ("SSI") benefits or disability insurance benefits ("DIB").  The Commissioner filed a response to Howell's Motion [Doc. 19], and Howell filed a reply [Doc. 20].  Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court denies the motion as discussed below.

I.    <u>**PROCEDURAL RECORD**</u>

    On July 11, 2007, Howell applied for SSI and DIB [AR 15, 124, 133], alleging she was disabled from November 30, 2004, [AR 15], due to Rheumatoid Arthritis ("RA"), bursitis, a back injury, asthma, and depression. [AR 77, 167.]  Howell's  application was denied at the initial and reconsideration levels. [AR 73, 75, 76, 77, 82.]  On August 17, 2009, an ALJ sitting in Houston, Texas conducted a video hearing, during which Howell and her attorney were present in El Paso.

[AR 30-72.] On November 5, 2009, the ALJ issued a decision finding Howell not disabled. [AR 15-23.]  Thereafter, Howell filed a request for review.  On November 3, 2010, after considering additional evidence, the Appeals Council denied Howell's request for review and upheld the final decision of the ALJ. [AR 5, 8, 9.]  On December 28, 2010, Howell filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Howell was born on January 4, 1973, and was 36 years old at the time of the ALJ hearing. [AR 21, 73, 44.] Howell completed the tenth grade of high school in Mississippi where she was born and raised, and obtained her GED in about 1995. [AR 21, 172, 308.] She tried to go to nursing school but could not complete it. [AR 45.] Howell obtained her commercial driving license from the State of Mississippi. [AR 268.] Her past relevant work included nurse's aide, truck driver, cement truck driver, and school bus driver, but her earnings records are erratic. [AR 21, 137.]

As of 2009, Howell had three children – a 13-year old son, and two younger children, ages 1 and 3. [AR 10, 44, 188.] She stated she was married twice. [AR 308.] She moved to Las Cruces in 2006, where she lives in a mobile home.  She receives income assistance and food stamps. [AR 49.] Howell is a smoker.

## II.   STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .;"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, she is capable of performing other work.[8]

At step five, the ALJ can find that the claimant met her burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

In this case, the ALJ relied on testimony from a vocational expert in making his determination of non-disability at step five of the analysis. [AR 22.]

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the

_____

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After carefully considering the evidence, the ALJ denied Howell's request for benefits. [AR 15-23.] The ALJ determined, in part, that Howell had not been engaged in substantial gainful activity since November 30, 2004, her date of onset. [AR 17.] While she worked several months in 2006, that work did not rise to the level of substantial gainful activity. The ALJ decided that Howell had severe impairments, including "low back pain, chronic obstructive pulmonary disease (COPD), cervical pain, arthritis of the left hip, and right shoulder pain." [AR 18.] The ALJ determined that Howell's mental impairment of depression was not severe. [AR 18.] None of Howell's impairments or combination of impairments met listing criteria. [AR 18-19.]

The ALJ found Howell had the RFC to perform light work and was limited to lifting or carrying 20 pounds occasionally, 10 pounds frequently, and sitting, standing or walking for six hours a day. She could balance and kneel. She could occasionally reach overhead with the upper right extremity. She could not climb ropes, ladders, or scaffolds. She must avoid exposure to extreme heat or cold, gases, fumes, dusts, odors, chemicals, and poor ventilation. She was only able to give

attention and concentration for two hours at a time before requiring a short work break.  She could understand, carry out, and remember simple, routine, and repetitive one-to-three step tasks.  Her ability to adapt to changes in the workplace, relate to co-workers, and interact with supervisors was fair ("limited but satisfactory").  [AR 19.] The ALJ determined that Howell could not perform any past relevant work, based on a vocational expert's testimony. [AR 21.]

Considering Howell's younger age, high school education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that she could perform. In so finding, the ALJ relied on testimony of the VE, who stated that Howell could perform the duties of an office helper, cashier, and survey worker. [AR 22.] The ALJ stated that the VE's testimony was consistent with information contained in the Dictionary of Occupational Titles ("DOT"). [AR 22.] Thus, the ALJ concluded that Howell was not disabled as defined by the SSA.

## IV.   <u>MEDICAL AND WORK HISTORY</u>

Howell indicated in one disability services form that she worked from 1995 to November 30, 2004 as a heavy equipment operator for a construction company. [AR 168.] However, her earnings records are erratic, ranging from $312.00 in 1995 to $14,250 in 1999 to $9,841 in 2004. [AR 137.] Moreover, while at times, Howell stated she worked until November 30, 2004, she also indicated she was released from her job in May 2004. [AR 294, 301.] She set forth an onset date of disability on November 30, 2004. [AR 15.]

### *2004 Medical Records*

A letter written by Howell's physician to her attorney in September 2004, indicates Howell was in her "usual state of good health" up until she was involved in a motor vehicle accident ("MVA") in December 2003, while driving a cement truck. [AR 294.] As of this date, the attorney described a vehicle coming across traffic and striking Howell's right fender up to the right

passenger-side door.  Later, Howell reported to providers that it was a head-on collision where she struck her head against the windshield. [AR 432-33.] According to the 1994 letter, Howell was thrust "side-to-side" in her seat.  She felt fine until she stood up and then suffered from a "burning sensation" from the base of her lower spine to her neck.  She developed headaches and neck stiffness.  She was taken to a hospital, where x-rays were taken, and then released.  While Howell continued to have pain in her shoulder blades, headaches, and nausea, she still worked for the trucking industry.  Dr. Jackson reported that the straight leg raising test was negative and that she had excellent range of motion in her lumbar and cervical spine.  Generally, her exam was within normal limits.  There was some loss of the left ankle reflex.  The doctor surmised Howell might have a disc herniation or other spinal cord compromise, but was uncertain.  He planned to order studies. Howell was given trigger point injections and massage therapy, along with Zanaflex, a muscle relaxant. [AR 295.]

An MRI of Howell's cervical spine in November 2004, indicating mostly normal results. [AR 298.]  There was disc degradation by diminished disc signal and mild annular displacement at C6-7.  There was no focal disc bulge or herniation and no spinal cord abnormality or other significant pathology.  [AR 296-97.]

In December 2004, Howell had physical therapy ("PT") for complaints of low neck and lumbar/left hip pain.  Howell related the pain to two work-related incidents, including a lifting incident in mid-2003, and the MVA in December 2003.  She was no longer working and would not return to her previous line of work.  Zanaflex was helping her pain.  Howell reported having discarded all of her pain medications that did not work.  Her nerve conduction study was noted as normal. [AR 301.]

Howell attended numerous PT appointments, but reported she had not improved with therapy. [AR 269, 271, 278.]

### *2005 Medical Records*

There is a single medical record from 2005 – an MRI report of Howell's thoracic spine, indicating mild thoracic scoliosis, but no acute abnormalities. The test result was negative for compression fractures, spinal stenosis, or cord lesion. [AR 277.]

### *2006 Work and Medical Records*

Howell moved from the South to Las Cruces, New Mexico at some point in 2006. She worked for two months at the end of 2006 as a concrete truck driver. She stated she stopped due to a medical condition and did not work after December 1, 2006. [AR 157.]

The only medical record in 2006, is an appointment on December 29, 2006, to establish medical care with Dr. Frances Attiogbe. [AR 340.] The record indicates Howell had chest and nasal congestion. Dr. Attiogbe noted asthma and acute bronchitis, although Dr. Attiogbe's handwriting is not always legible. Complaints of pain were not documented on this record.

### *2007 Medical and Disability Records*

Howell saw Dr. Attiogbe on eight occasions during 2007. Most of these medical records indicate Howell was seen and treated for asthma and respiratory distress. At times, she was prescribed Prednisone for her breathing problems, inhalers, Albuterol treatments, Advair, Atrovent, and nebulizer treatments. [AR 331, 333-35, 337-39.] One record states Howell was hospitalized in about August 2007, but there are no corresponding hospital records. [AR 334.] Howell told Dr. Attiogbe on January 29, 2007, that she might have had seizures and that she wanted a referral to a pain clinic. [AR 339.]

On July 31, 2007, Howell reported to Dr. Attiogbe she was experiencing pain in both arms, back pain, and had difficulty lifting. She could not bend over or take deep breaths without pain. Dr. Attiogbe counseled Howell to stop smoking on this occasion and during other visits, but it does not appear that Howell ever stopped smoking, notwithstanding complaints of significant breathing problems. [AR 336.] On August 8, 2007, Dr. Attiogbe noted Howell's lower back pain, dyspnea, and shortness of breath, but the chest x-ray taken on September 12, 2007 was normal. [AR 341.] On October 22, 2007, Dr. Attiogbe indicated asthma and "COPD." [AR 333.]

On July 11, 2007, Howell filed applications for DIB and SSI. [AR 15.] The disability services interviewer observed Howell having problems with understanding, answering, sitting, and standing. However, the interviewer did not note breathing problems. [AR 152.]

Howell alleged the illnesses that limited her ability to work were RA, bursitis, back injury, and asthma. [AR 166.] There are no medical records at this point confirming that Howell was diagnosed with Rheumatoid Arthritis or bursitis. Howell contended she was in constant pain and had no energy.

On August 2, 2007, Howell filled out a disability services asthma history form. She reported asthma attacks every 20 minutes that lasted 20 to 60 minutes. She was short of breath upon exertion. She was weak and dizzy. Her asthma attacks "just happened." She might be sitting or cleaning when she had an attack. She could clean her house in intervals and had a friend give her rides because of Howell's asthma attacks. [AR 182.] Her prescriptions were Advair, two times a day, Albuterol treatment, every six hours, Albuterol inhaler, four times a day, Spiriva, one puff a day, and one tab of Prednisone every day. Howell also took Tramadol twice a day for pain. She smoked about 10 cigarettes a day. [AR 182-84.]

9

As of this date, Howell lived in a mobile home and took care of her two children – an 11 year old son and a 10 month old son.  She did not have trouble with her personal care.  She could prepare meals and bake sometimes.  Howell fixed three meals a day; some took 40 minutes up to two hours.  She could sweep and mop the floor in intervals.  Howell went outside every two days.  She did not drive and usually was given a ride or took public transportation.  She could shop for groceries several times a month and could pay her bills. [AR 191.] She suspected she sometimes had seizures, although the medical records do not confirm her suspicions.  Howell watched television every day and read.  She used to enjoy sports but could not engage in sport activities now.  Sometimes, when low on food she ate at a community center.  Howell marked off most of the boxes indicating all aspects of her physical condition were affected by her alleged disabilities.  She contended she was diagnosed with RA and had three bulging discs and one herniated disc.  Again, none of those diagnoses or conditions are confirmed by the objective medical evidence. [AR 196.] Howell noted that she intended to change doctors because of some conflict Dr. Attiogbe apparently had.  However, Howell continued to see Dr. Attiogbe. [AR 196.]

On October 13, 2007, Dr. Carlos Pastrana conducted an evaluation of Howell for disability services. [AR 303.] Howell reported she suffered from asthma since her 20s.  Her asthma had not been very bad until she was exposed to acid fumes in a bathroom at work three or more years earlier.  She then had difficulties breathing and was taken to the emergency room in Mississippi, where she lived then.  She also reported a history of having been displaced due to the Katrina hurricane.  Howell lived in trailers that had strong smells, and her asthmatic symptoms worsened.  She frequently suffered from bronchitis and now had to use medications for her lungs all the time.  She stated she was diagnosed with COPD on September 12, 2007, yet the x-ray from that date indicated a normal chest.  Howell also reported that she was diagnosed with RA when she was 14 years old

and had suffered from left hip pain and bursitis for several months.  She injured her lower back, neck and head in MVA three years ago.  She complained of chronic lower back pain if she sat, stood, or engaged in bending.

Dr. Pastrana noted that the MRI of Howell's lumbar spine and the nerve conduction study in November 2004 were normal.  Howell coughed frequently during the exam, but ambulated well, and could get on and off the exam table.  She was able to dress and undress.  Her lungs indicated slightly decreased breath sounds bilaterally but no rales,[10] rhonchi,[11] or wheezing.  Her gait was good and she had good grip strength in both hands.  There was pain upon movement of her left hip and mild tenderness of the cervical spine.  Dr. Pastrana listed impressions of COPD with chronic cough, asthma, questionable history of RA as she had no swollen joints, hip pain and tenderness with full range of motion, chronic lower back pain, and decreased range of motion of the lumbar spine. Howell might have degenerative disc disease, but there were no radiological exam reports to confirm the condition.  [AR 303.]

On November 1, 2007, David Sachs, Ph.D, performed an evaluation and testing of Howell for disability services. [AR 307.] Howell was prompt for her appointment, neat and clean.  She reported developing COPD three years earlier when she used a bathroom that had been cleaned with acid.  She attempted to take her employer to court about the problem and filed for worker's compensation.  Howell believed that as a result of those legal actions, a judge removed her daughter

---

[10]"Crackles, crepitations, or rales are the clicking, rattling, or crackling noises that may be made by one or both lungs of a human with a respiratory disease during inhalation." http://en.wikipedia.org/wiki/Crackles (Mar. 15, 2012).

[11]"Rhonchi is the coarse rattling sound somewhat like snoring, usually caused by secretion in bronchial airways. Rhonchi is the plural form of the singular word rhonchus." http://en.wikipedia.org/wiki/Rhonchi (Mar. 15, 2012).

from her and gave the father custody.  Her daughter was now 12 but Howell had not seen her since she was 3. [AR 307.] Howell claimed to have a history of RA since she was 14 years old that was in remission until she was involved in the December 2003 MVA.  Her symptoms had begun to recur.  She suffered from shortness of breath, difficulty sleeping, irritation, mood changes, and back and leg pain.  She had difficulty remembering things and felt she had seizures since the accident.  She feared driving because of the risk of having a seizure.  She recently described having fallen to the floor when her body was "jerking."  There was no EEG or CT testing.  Howell's current medications were for COPD.

Howell was born and raised in Mississippi.  She married at age 18, and divorced at 22.  She had been separated from her second husband for 12 years.  She reported having been physically abused by both husbands and sexually abused as a child between the ages of 8 and 13 ("touching only"). [AR 308.]  She currently had a boyfriend who helped her.

Dr. Sachs observed that Howell frequently stood during the interview because of discomfort.  She described her daily activities in a very limited manner.  Howell felt depressed.  Intellectually, Dr. Sachs found she was average in her verbal abilities and at the upper end of borderline in her nonverbal abilities.  Her full scale IQ was 84.  Howell had problems maintaining good attention and concentration.  He diagnosed her with major depression, "rule out cognitive disorder," COPD, chronic pain syndrome, RA, history of seizures."  She had a GAF of 52. [AR 309.]

On November 8, 2007, Leroy Gabaldon performed a record review and a mental RFC assessment.  He found Howell moderately limited in her ability to remember locations and understand detailed instructions.  She could understand short, simple instructions.  She was moderately limited in the ability to carry out detailed instructions and maintain attention for a long period.  She was moderately limited in making simple work-related decisions. [AR 311.] She had

moderate limitations in her ability to accept instructions and respond appropriately to criticism, to get along with coworkers or peers, and to respond appropriately to changes in the work setting. [AR 311-12.]  Dr. Gabaldon wrote that Howell's assertion of impairment "does not appear to be consistent with available evidence." [AR 313.] While she reported abuse, there were no hospitalizations and no records of attempted suicide.  She could engage in household tasks and leisure and social activities.  She could understand, remember, and carry out simple instructions. [AR 313.] Dr. Gabaldon noted a diagnosis of major depression.

Gabaldon also filled out a Psychiatric Review Technique form, finding co-existing nonmental impairments.  He found Howell had an organic mental disorder and affective disorder (12.02 and 12.04), but that the disorders did not meet listing criteria.  Howell had mild restrictions in daily activities and social functioning; moderate restrictions in concentration; and insufficient evidence of decompensation. [AR 249.]

On November 14, 2007, Dr. Margaret Vining performed a physical RFC Assessment.  She found Howell was limited to lifting 20 pounds occasionally and 10 pounds frequently.  Howell could stand, sit or walk for six hours per work day.  Her ability to push and pull was unlimited.  Dr. Vining discussed inconsistencies between Howell's allegations and objective test results.  Testing had shown one mild disc problem in the cervical spine and mild scoliosis in the thoracic spine and tender musculature in many areas.  There as no radiculopathy on exam and no evidence of RA.  There was no medical evidence of lung disease.  Dr. Vining found Howell could work at a light level with some postural and environmental restrictions. [AR 317.] There were occasional limitations in her ability to climb.  She was never to climb ladders or ropes.  Dr. Vining found occasional limitations with her ability to stoop and crouch.  She could kneel and balance.  [AR 317.] Howell had no manipulative limitations.  She was to avoid extreme cold and fumes. [AR 319.]

13

In November 2007, Howell's applications for DIB and SSI were denied.  The applications noted that the primary diagnosis was major depression and the secondary diagnosis was degenerative disc disease of the cervical spine. [AR 73.]

### *2008 Medical and Disability Records*

In 2008, Howell saw Dr. Attiogbe about five times, complaining both of problems with breathing or COPD and pain. [AR 374-75, 327, 329, 330.] In January, Howell complained of lower back pain and muscle cramping in her hands and feet.  She stated that the prescription of Ultram[12] made her nauseated. [AR 330.] On January 14, 2008, Howell filed a request for reconsideration and stated she was very much in pain, short of breath, and unable to work. [AR 81.] On that same date, she saw Dr. Attiogbe for a persistent cough, sinus pressure, abdominal pain, swelling in her hands, and pain at night.  Dr. Attiogbe noted lower pack pain, acute sinusitis, and asthma.  She was prescribed Naproxen.[13] [AR 329.]

Howell filled out a disability report - appeal, claiming she felt worse and had less energy as of October 15, 2007.  She was depressed.  She was taking Acetaminophin (Tylenol) for pain but it was not affective.  Howell also had prescriptions of Advair, Albuterol sulfate, and an Atrovent inhaler. [AR 200.] On January 18, 2008, Howell saw Dr. Attiogbe.  Howell did not feel better and still had shortness of breath after two nebulizer treatments.  On January 29, 2008, Dr. Attiogbe changed the prescription for Tramadol as it made Howell sick.

---

[12]"This medication is used to help relieve moderate to moderately severe pain. Tramadol [Ultram] is similar to narcotic analgesics. It works in the brain to change how your body feels and responds to pain." http://www.webmd.com/drugs/drug-11276-Ultram (Mar. 15, 2012).

[13]"Naproxen is used to relieve mild to moderate pain from various conditions. It also reduces pain, swelling, and joint stiffness from arthritis. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID)." http://www.webmd.com/drugs (Mar. 15, 2012).

On January 31, 2008, Howell filled out a function report.  She awoke early, took her breathing treatment, rested, and woke up her oldest child for school.  She watched television and rested and then attended to her baby.  Howell took a bath, watched more television, and baked.  She took an hour-long nap and a breathing treatment. [AR 206.] She washed half the dishes, rested, then completed the dishes.  She prepared a microwave lunch, ate and rested.  She cleaned in intervals, watched, television and rested.  She described how often she took breathing treatments.  She and her boyfriend ate and watched movies together, two or three times a week.  Her boyfriend and son helped her with some tasks.  [AR 209.]  Howell could not do yardwork as it was too painful.  She rode along in a car and could drive but did not like to drive as she tended to forget what she was doing. [AR 210.]  She shopped for 2-4 hours with someone.  She could manage her finances but forgot things and made mistakes. [AR 210.] Her hobbies were television and reading.  She was able to play ball with her children before her injuries.  She described lifting as excruciating and said she feared getting back up if she squatted.  Bending hurt her.  Standing for a long time was difficult.  Howell also could not sit long and could only walk one block.  She paid attention for 15-30 minutes. [AR 212.]

Apparently, Howell attempted to get someone from the Community of Hope to fill out a third-party report for her, but according to the case manager, the employee only worked there and did not know anything of Howell's condition. [AR 223.]

On March 11, 2008, Howell's request for reconsideration was denied.

On May 8, 2008, Howell went to Ben Archer Health Center for back pain and seizures. [AR 354.] She had taken an Albuterol treatment before coming to the clinic.  She was using a nebulizer six times a day.  She complained of back pain and stated she was out of seizure and nebulizer medications.  Howell was five months pregnant.  She had been seen by an OB/GYN physician and

according to Howell, those physicians stated it was all right for her to take anti-seizure medications. (The medical records do not indicate Howell ever took seizure medications.)  The assessment was "pregnant, seizures, asthma, rhinitis."  The medical care provider did not give seizure medication to Howell and said she could get it from the OB/GYN if approved.  The provider prescribed Advair and Loratidine (Claritine or an antihistamine). [AR 354.]

On May 11, 2008, Howell went to Memorial Medical Center.  She arrived by private vehicle, and complained of breathing trouble and a history of COPD.  She was approximately 22 weeks pregnant, which would be closer to three months pregnant.  She complained of pain that improved after treatment.  The onset of breathing trouble began two weeks prior.  She was out of Albuterol. Examination, after treatment, showed normal non-labored respiration, although shallow respirations. Wheezing was noted.  Howell was at the hospital for about an hour and a half.  The care provider noted Howell did not appear to be in apparent distress or acutely ill. [AR 351.] Howell's smoking was noted as a major risk factor. [AR 352.]

Howell was seen several more times in late May at Ben Archer for breathing problems. [AR 355, 357.] She also filled out another disability report near this time. [AR 227.] She reported more problems with breathing, less energy, and more pain starting February 1, 2008.  She took Albuterol for COPD and Tylenol for pain. [AR 227-232.]

On November 17, 2008, Howell complained of pain in both shoulders and requested medication from Dr. Attiogbe for her asthma.  She needed refills. [AR 375.]  On November 29, 2008, Howell presented to the ER at Mountain View Medical Center in Las Cruces. [AR 359.] Her primary complaint was lower back pain.  She was taking 800 mg. of Ibuprofen but it did not control her pain.  The pain was non-radiating and did not affect her walking.  She stated she had degenerative disc disease in her neck and that it had worsened a few days before, after her ex-

16

boyfriend "assaulted her."  She claimed to have a seizure disorder.  Her lungs were clear.  There was normal range of motion in the joints and no swelling. [AR 360.] She was discharged after about one and one-half hours.  She was given a prescription for Vicodin.[14] [AR 359.

A chest x-ray, taken December 10, 2008, was normal. [AR 368.]

On December 19, 2008, Dr. Attiogbe prescribed Percocet[15] for Howell's complaints of mid-back pain. [AR 374.]

There was no mention of Howell's pregnancy in later 2008 records, but it appears she gave birth, based on subsequent records.  For example, at the August 17, 2009 ALJ hearing, Howell mentioned caring for a one-year old that weighed 21 pounds then. [AR 44.]

### *2009 Medical and Disability Records*

On January 5, 2009, there is a note indicating Howell suffered a miscarriage on this date. [AR 382.] However, based on the dates, this must have been another pregnancy.

On January 14, 2009, Howell saw Dr. Attiogbe, with complaints of shoulder blade and lower back pain.  She told Dr. Attiogbe she had a miscarriage after taking Depo-provera[16] for birth control. Howell complained of coughing and congestion.  The assessments were acute bronchitis, asthma, and shoulder pain.  In 2009, Howell complained on many occasions about shoulder pain. [*See, e.g.,*

---

[14]"This combination medication is used to relieve moderate to severe pain. It contains a narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen)." http://www.webmd.com/drugs/drug-3459-Vicodin (Mar. 15, 2012).

[15]"This combination medication is used to help relieve moderate to severe pain. It contains a narcotic pain reliever (oxycodone) and a non-narcotic pain reliever (acetaminophen)." http://www.webmd.com/drugs/drug-7277-Percocet (Mar. 15, 2012).

[16]"Depo-Provera is a branded progestogen-only contraceptive, depot medroxyprogesterone acetate (DMPA) long acting reversible hormonal contraceptive birth control drug that is injected every 3 months."  http://en.wikipedia.org/wiki/Depo-Provera (Mar. 15, 2012).

AR 388-391.] On January 14, she was prescribed Albuterol, Advair, Percocet, Augmentin (antibiotic), and another medication that is not legible. [AR 373.]

Howell continued to see Dr. Attiogbe numerous times in 2009.  Howell complained of shortness of breath asthma, and pain during many of the 18 appointments.  She was prescribed Percocet and Prednisone on numerous occasions and received trigger point injections for pain. [AR 373, 377, 378, 380-82.] Dr. Attiogbe again counseled Howell to quit smoking. [AR 379.]

On April 21, 2009, Howell had a CT of her brain related to complaints of headaches.  The CT study was normal. [AR 383.]

On May 26, 2009, Howell told Dr. Attiogbe that Percocet was not working for her.  It was making her break out and did not help her sleep.  She was still in pain and had lower back pain.  Dr. Attiogbe prescribed Ambien, a sleep medication. [AR 392.]

On June 4, 2009, Howell complained of right shoulder pain, mid-back pain, and lower back pain. [AR 391.] A June 10, 2009 x-ray of her right shoulder was normal. [AR 394.] On June 17, 2009, Howell told Dr. Attiogbe that her right shoulder pain "came and went."  She had been feeling pain in the right shoulder for several months.  She was given a trial of Toradol.[17] [AR 391.]

On June 25, 2009, Howell complained that the nebulizer and inhalers were not working and that she could not breathe well.  She had lower back pain and had twisted her back while turning.  She complained of stiffness in her right shoulder.  The Toradol did not help her pain.  She was given a trigger injection and prescribed Naproxen. [AR 389.] On June 29, 2009, Howell again complained of right shoulder pain.  She was prescribed Flexeril (muscle relaxant).  An MRI was ordered. [AR 388.] The MRI showed an abnormal right shoulder with evidence of a joint effusion associated with

---

[17]Toradol or "Ketorolac is used for the short-term treatment of moderate to severe pain." http://www.webmd.com/drugs/drug-57955-Toradol (Mar. 15, 2012).

a labral tear, with probable partial avulsion of bicipital anchor, a tear of the inferior ligament, and a prominent cyst. [AR 385.] Dr. Attiogbe referred Howell for an orthopedic evaluation and treatment, as needed. [AR 387.] On August 7, 2009, Howell still presented to Dr. Attiogbe with shoulder pain. She also complained of chest pain and confusion while driving. She asked Dr. Attiogbe to fill out disability paperwork for her lawyer, but no forms appear in the administrative record. [AR 444.] Howell was referred to the pain clinic. [AR 444.]

On August 12, 2009, Howell's attorney submitted a brief to the ALJ. [AR 245.] The brief summarized Howell's complaints and treatment since 2004. The attorney stated that Howell was unable to lift more than a gallon of milk. [AR 248.]

On August 17, 2009, the ALJ conducted a video hearing from Houston. Howell and her attorney were present in El Paso. [AR 30-72.] In response to questions by her attorney, Howell stated that she felt she could not work due to problems breathing and back pain. She had a diagnosis of COPD. She testified that she had her tailbone broken at least a dozen times, although there is no objective medical evidence supporting this injury on even one occasion. Howell also stated she had two misplaced discs and a "damaged lumbar." [AR 33.] She was not taking any medications for her back. At times, she was prescribed Lortab or Percodan, but she did not like using these medications as she was unable to function well when taking them. [AR 33-34.] She rated her back pain as a 9 on a scale of 1-10. When she took pain medication, her back improved for "just a little while" and then she became nauseated. The worst back pain happened nearly every day and lasted all day and most of the night. [AR 36.]

With respect to her shoulder, Howell testified that she had taken Levaquin (antibiotic). She did not have an orthopedic appointment for her shoulder until after the ALJ hearing, on August 26. [AR 35, 36.]

19

Howell discussed her prior work.  Primarily, she drove trucks.  She also worked at Burger King at some point and had tried to work as a nurse's aide.  Howell testified that she could not lift weight over her head and had trouble lifting a car carrier with a baby. [AR 36, 38.] She could lift a gallon of milk but not more.  When later asked by the ALJ if she could lift her 21-pound one year old, she answered "most definitely." [AR 44.]

Howell stated that she could not stand long or her back hurt.  She could walk a city block.  Her back pain and trouble breathing prevented her from walking.  She had trouble sitting due to her tailbone injury. [AR 39.] She was unable to climb steps without losing her breath and feeling dizzy. [AR 39.] Both hands cramped up and she had trouble gripping.

Howell had trouble turning her neck although it was a little better.  She had been told she had a disc problem.  It was difficult for her to hold her neck to read because it began to cramp and burn after 5-10 minutes. [AR 41.] Howell also had difficulties concentrating or staying focused.  She became confused just going to and returning from the store.  She helped care for her children, washed dishes, cleaned up the kitchen and swept the floor.  Mopping was more difficult.  She did most of the cooking but has had more trouble doing it. [AR 42, 43.]

In response to questions by the ALJ, Howell stated she lived in a trailer with her two sons and daughter, ages 1, 3 and 13. [AR 44.] She was able to take care of the children by herself. Howell had to climb steps to get into her trailer.  She lost coordination in her left hand, and her right shoulder was bothering her with a rotator cuff tear. [AR 45.] She was 5'4" and weighed 154 pounds. [AR 45.] She no longer drove alone because she was afraid.

While her onset date was November 30, 2004, she stated that nothing special occurred on that date.  She just had not been able to work since then. [AR 46.] She was receiving income assistance, food stamps, and Medicaid.  She received Section 8 help as well.

Howell testified that she had chronic bronchitis.  She smoked and had increased her smoking due to stress. [AR 50.] Howell smoked a pack a day.  She had gone to the ER for breathing problems in the last 12 months on 6 or 7 occasions but was not admitted.  [AR 50, 51.]  There are no corresponding hospital visits showing 6 or 7 visits.  Howell used her nebulizer at home four times a day.  She used it once before bed and once in the middle of the night. [AR 53.]

With respect to her back pain, she treated it with hot baths. [AR 54.] She did not like to take narcotic pain medications because they made her feel nauseated. [AR 54.] She had not taken that type of medication for a long time.  She was only taking Tylenol for pain. [AR 55.] Howell stated she had been told she had bursitis, rather than RA.  She also had hip problems.

Howell was not on any medication for depression and had not told the doctor she was depressed. [AR 56, 57.] She had never been treated for depression.

With respect to her shoulder pain, Howell stated that her right shoulder bothered her that day, but on some occasions, her left shoulder hurt her. [AR 57, 58.] Howell felt her right shoulder pain was getting a little better and that she had pretty good range of motion now. [AR 66, 67.]

The ALJ asked the VE a number of hypothetical questions, and Howell's attorney followed up with questions. [AR 66-69.]

On August 24, 2009, Howell again saw Dr. Attiogbe, complaining of shortness of breath, shoulder and hip pain.  She asked for birth control pills. [AR 443.]

An x-ray taken on August 26, 2009 showed a well-defined cyst in her shoulder. [AR 401.] On that same day, Howell saw Dr. McGuire, an orthopedic specialist.  Howell stated that her right posterolateral shoulder pain started six years ago after the truck accident.  She described the December 2003 accident as causing her to strike her head on the windshield.  She felt she had "gone downhill" ever since then. [AR 399.] She denied neck pain but had a history of C6 and C7 disc

problems.  Howell brought disability forms with her, but Dr. McGuire explained that he did not fill those out.

Dr. McGuire examined Howell and noted no gross atrophy about her shoulder.  Her digits moved well.  There as no real pain with certain rotations.  The range of motion was limited.  The x-rays showed a well-defined cyst in the glenoid.[18]  It was read as a possible superior labral tear. Howell denied instability.  Dr. McGuire assessed her with right shoulder pain with impingement syndrome and could not rule out "SLAP lesion."[19]  He recommended a trial of physical therapy with the understanding that if she had a SLAP lesion, therapy would not heal it.  He offered her a subacromial steroid injection to if it would settle down the pain.  If the problem did not improve, Dr. McGuire suggested considering arthroscopy with SLAP repair. [AR 399.]

On September 8, 2009, Howell's attorney wrote the ALJ, advising him that the information concerning the MRI and orthopedic appointment was being sent.  Dr. McGuire, however, refused to complete the RFC questionnaire and counsel asked the ALJ to order the physician to complete it. [AR 397.] No such form appears in the administrative record.

On September 15, 2009, Dr. Attiogbe refilled Howell's birth control prescription.  Howell was to start physical therapy. [AR 442.]

On September 22, 2009, Howell began physical therapy on the right shoulder. [AR 432.] Howell complained mainly about her neck and back pain and wanted a full evaluation of her neck

---

[18]"The shoulder joint has three bones: the shoulder blade (scapula), the collarbone (clavicle), and the upper arm bone (humerus). The head of the upper arm bone (humeral head) rests in a shallow socket in the shoulder blade called the glenoid."  http://orthoinfo.aaos.org/topic.cfm?topic=a00426 (Mar. 15, 2012).

[19]"A superior labral anterior-posterior (SLAP) lesion is an injury to the part of the shoulder called the labrum."  http://www.orthospecmd.com/SLAPlesion.html (Mar. 15, 2012).

and back for her current disability application.  The therapist explained to her that she would not be able to do disability evaluations and that Howell would have to see her primary care doctor for that. Howell stated that she took care of her two young children, ages 1 and 3, her 14 year old son and 18 year old daughter.  Howell reported she had problems with daily chores and cleaning.  She rated her pain level as a 4 on a scale of 1-10.  At worse, it was an 8.  Daily activities and child care tended to increase her pain.  Taking hot baths decreased her pain.  Howell described the December 2003 accident as a head-on collision in which she hit her head on the windshield.

During this visit, the therapist noted that Howell presented inconsistencies with her cervical range of motion.  She demonstrated full range of motion in the cervical area when attending to her children in the treatment room vs. testing when it was limited.  There were inconsistencies in her muscle testing as well. [AR 433.] The therapist questioned Howell's compliance based on missed appointments allegedly due to "forgetful spells."  The therapist noted that Howell often had to cancel appointments purportedly due to "lung problems." [AR 433.]

On September 24, 2009, Howell saw Dr. Attiogbe for neck, back and chest pain.  She was prescribed Percocet. [AR 441.] On October 9, 2009, Dr. Attiogbe refilled prescriptions.   On November 4, 2009, Dr. Attiogbe refilled the Percocet prescription. [AR 439.]

On November 5, 2009, the ALJ issued an adverse decision, denying benefits to Howell. [AR 15-23.]

On December 14, 2009, Howell requested review, stating she was too sick to work.  She also noted she was about to run out of income assistance. [AR 10.] On December 22, 2009, Howell complained of chest pain and neck and right shoulder pain.  She felt tingling and cramping in both hands.  She was prescribed Percocet. [AR 438.]

### *2010 Medical Records*

Howell saw Dr. Attiogbe on four more occasions in early 2010, complaining of neck and back pain.  She requested refills for Percocet and birth control medication. [AR 434, 436-37.] On March 24, 2010, Howell complained of left shoulder pain and leg pain. [AR 434.] Dr. Attiogbe again counseled Howell to quit tobacco abuse. [AR 435.]

On November 3, 2010, the Appeals Council denied Howell's request for review after considering additional medical records. [AR 5, 8-9.]

## V.    DISCUSSION

Howell presents three arguments in support of remand: (1) the ALJ's credibility determination was not supported by substantial evidence and was legally deficient under Tenth Circuit authority; (2) the ALJ failed to develop the record regarding her respiratory problems; and (3) the step-five findings were unsupported by substantial evidence because the VE testimony conflicted with the DOT and failed to support a finding that Howell could perform other jobs.  [Doc. 18, at 1.]

### A.    Credibility Determination

Credibility findings are "peculiarly the province of the finder of fact, and . . . [will not be] upset . . . when supported by substantial evidence." Kepler v Chater, 68 F.3d 387, 391 (10th Cir. 1995) (internal citations and quotations omitted).  The reviewing court does not substitute its own judgment for that of the fact finder.  Moreover, a reviewing court recognizes "that some claimants exaggerate symptoms for purposes of gaining government benefits, and that deference to the fact-finder's assessment of credibility is the general rule." Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987).  However, deference is not an absolute rule. "[F]indings as to credibility should be closely

and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler, 68 F.3d at 391 (internal citations and quotations omitted).

In evaluating a claimant's credibility as to symptoms, the Commissioner considers all symptoms that can reasonably be accepted as consistent with the objective medical evidence and other evidence, reports of doctors, diagnoses, prescribed treatment, daily activities, efforts to work, and any other pertinent evidence. 20 C.F.R. § 404.1529(a). A claimant's statements about pain or other symptoms alone does not establish disability. Id. In evaluating the intensity and persistency of symptoms and pain, the Commissioner considers all available evidence, including what medications have been used, how the symptoms affect a claimant's pattern of daily living, the location, duration, frequency, and intensity of pain, precipitating and aggravating factors, type, dosage, effectiveness of medications, treatment, or other measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3).

In this case, Howell challenges the ALJ's credibility findings with respect to her respiratory problems.[20] Howell claims that the ALJ minimized her symptoms of asthma/COPD "by finding her not credible in a ten (10) lines paragraph assessment." [Doc. 18, at 4.] She further asserts that the ALJ improperly "played doctor," by stating that Howell's continued smoking enhanced her respiratory problems. Howell argues that the ALJ ignored objective medical evidence of at least 17 visits to the doctor regarding respiratory complaints. Finally, according to Howell, the ALJ did not

---

[20]While Defendant argues that the ALJ's credibility findings were sufficient as to all of Howell's impairments, the Court limits its discussion of credibility to Howell's respiratory condition. That is because Howell's brief discussed the ALJ's credibility findings only with respect to her asthma/COPD and other respiratory problems. [Doc. 18, pp. 3-6.] However, the Court observes, in passing, that the ALJ's credibility findings regarding Howell's other conditions are thorough and well-supported. [AR 20.] If anything, the ALJ gave Howell the benefit of the doubt in reaching his credibility findings as to her neck, back and shoulder pain because the ALJ omitted mention of health care providers' and disability reviewing physicians' observations of inconsistencies in the record and testing.

adhere to Tenth Circuit law that requires credibility findings be "closely and affirmatively linked to substantial evidence." [Doc. 18, at 6.]

As noted, the ALJ found at step two that Howell had a severe impairment of COPD, and at step three, he determined that Howell did not meet listing 3.02 (chronic pulmonary insufficiency). [AR 18, 19.]  In relation to the RFC assessment, the ALJ proceeded to make credibility findings regarding Howell's various conditions.  The credibility findings generally were thorough. [AR 19-20.]

The ALJ found that Howell's described daily activities were not limited to the extent one would expect, given her complaints of disabling symptoms and limitations. [AR 20.] In addition, the ALJ noted that while receiving treatment for her impairments, the treatment was essentially conservative in nature.  The ALJ then discussed Howell's credibility in relation to each of Howell's alleged impairments, including neck and back pain, right shoulder pain, and asthma. [AR 20.]

Although the ALJ did not describe Howell's daily activities, he clearly considered them with respect to the credibility findings. [AR 20.]  Howell consistently stated she was able to take care of her children, including two toddlers.  She appeared to have been pregnant twice during the pertinent time frame.  She could watch television and socialize with her boyfriend.  Howell had little or no problems with her personal care activities, could prepare meals, and could clean the house in intervals. [AR 189.]

And, again, while the ALJ did not specifically discuss Howell's prescribed treatment for her breathing condition, he did state her treatment for all impairments was conservative.  This is true. No record indicates, for example, that Howell was on oxygen or that her oxygen saturation level was deficient.

With respect to the ALJ's more specific findings as to Howell's credibility concerning her asthmatic condition, he wrote:

> The claimant also reported that she has had asthma since age 20. However, she has alleged a productive cough since 2004 and COPD since 2007. . . .   The record indicates that the claimant smokes 10 cigarettes per day, which has enhanced her respiratory symptoms. Nevertheless, a physical examination of the lungs in October 2007 demonstrated only sightly decreased breath sounds bilaterally without rales, rhonchi, or wheezing. . . . Likewise, diagnostic imaging of the lungs has been normal.  Even though the claimant sought medical treatment for May 2008 due to trouble breathing, treatment notes confirm that she ran out of asthma medication.  In addition, the evidence substantiates unlabored respiration with good breath sounds after the claimant received treatment.  It should also be noted that the claimant was still smoking at the time of this incident. . . .

[AR 20-21] (internal citations to AR omitted).

The Court concludes that the ALJ's credibility findings, as set forth above, are "closely and affirmatively" linked to substantial evidence and that there was no error.  The ALJ discussed all of the significant objective medical testing with respect to Howell's breathing condition.  The discussion, even if 10-sentences long, is neither erroneous nor deficient.  Instead, the Court concludes it is supported by substantial evidence.

While Howell argues that the ALJ ignored Howell's approximately 17 visits to doctors concerning her breathing condition, those medical records are cursory in nature and are not convincing evidence of error by the ALJ.  For example, the medical and therapy records from 2004 until the end of 2006, omit any mention of Howell's asthma, COPD, or breathing issues.  On December 29, 2006, Dr. Attiogbe's notes indicate Howell had a sore throat, nasal congestion, chest congestion, and productive cough and that Howell had asthma and acute bronchitis. [AR 340.] In 2007, a number of the medical records briefly note Howell's complaints of asthma and breathing

problems, assessments of asthma, acute bronchitis, and prescriptions for nebulizing treatments, Advair, Albuterol, and on at least one doctor's visits, a prescription for Prednisone. [AR 338.]

On October 13, 2007, Howell told the consultative physician that she had asthma since her 20s, but that it had not been bad until about 3 and one-half years ago when she was exposed to acid fumes in a work bathroom. [AR 303.] However, there are no corresponding medical records to confirm that Howell was having breathing trouble as of 2004- December 2006.  Moreover, as noted by the ALJ, the consultative physician examined Howell in October 2007 and noted only "slightly decreased breath sounds bilaterally," and "no rales, rhonchi, or wheezing." [AR 20, 305.]

In 2008, Howell was seen many times by Dr. Attiogbe, when she complained of COPD, shortness of breath, and asthma, as well as other problems.  It is also true that on almost all of Dr. Attiogbe short medical forms, she wrote on the line next to "Respiratory:" the same words – "Diminished air entry," without further explanation. [*See, e.g.,* 327, 328, 329, 330, 331, 333, 336, 339, and 335, 337, 338 ("diminished air entry, a few bilateral exp wheezes").  On some of the same forms, Dr. Attiogbe noted Howell's oxygen saturation levels as 94-97%. [AR 328, 330, 331, 335, 336, 337.]

Howell made three short visits to the hospital in 2008, only one of which concerned her breathing problems, that she said began two weeks before the May 11, 2008 visit.  The ALJ discussed that hospital visit, noting that Howell presented with breathing problems but had run out of Albuterol.  Upon exam, the medical care provider found no acute respiratory distress and "[n]ormal non-labored respiration."  After treatment, as noted by the ALJ, Howell's respirations were "unlabored" and she had good breath sounds, "no audible rales, rhonchi, or wheezing." [AR 20-21, 350.] The ALJ also supported his credibility findings by discussing the normal December 2008 chest x-ray that indicated Howell's lungs were clear. [AR 20, 368.]

The medical records in 2009 are similar to those in 2008 – more visits to Dr. Attiogbe with complaints of Asthma, COPD, coughing, bronchitis, shortness of breath, and other problems. Dr. Attiogbe continued to prescribe the same or similar medications – *e.g.,* Albuterol and Advair. And, Dr. Attiogbe continued to counsel Howell to stop smoking. It appears that Dr. Attiogbe prescribed Prednisone on several visits in 2009. Contrary to Howell's assertions or inferences, Howell was not routinely prescribed Prednisone, and the occasional prescriptions for antibiotics were not necessarily linked to her breathing problems in every case.

In addition, Howell takes issue with the ALJ's discussion that Howell continued to smoke, notwithstanding her breathing problems or asthma, and the ALJ's presumption that smoking enhanced her problems.[21] The fact that Dr. Attiogbe counseled Howell to stop smoking on more than one visit and that medical care providers at the hospital similarly discussed the risks of smoking supports the ALJ's finding that Howell's smoking 10 cigarettes a day enhanced her respiratory symptoms. The Court does not find this to be an example of the ALJ "playing doctor." Howell admitted she heard the doctors counsel her to quit smoking, but did not describe attempts to quit smoking or explain why she did not attempt to quit. In other words, this is not a case where the

---

[21]While the Court agrees that common sense can mislead and that lay intuitions about medical phenomena are often wrong [Doc. 18, at 4], the fact that smoking can lead to death or disease is not merely "common sense" or "lay intuition." Medical research establishes that "tobacco use most commonly leads to diseases affecting the heart and lungs and will most commonly affect areas such as hands or feet with first signs of smoking related health issues showing up as numbness, with smoking being a major risk factor for heart attacks, Chronic Obstructive Pulmonary Disease (COPD), emphysema, and cancer, particularly lung cancer, cancers of the larynx and mouth, and pancreatic cancer. Overall life expectancy is also reduced in regular smokers, with estimates ranging from 10 to 17.9 years fewer than nonsmokers." "The carcinogen acrolein and its derivatives also contribute to the chronic inflammation present in COPD." "(COPD) caused by smoking, is a permanent, incurable (often terminal) reduction of pulmonary capacity characterised by shortness of breath, wheezing, persistent cough with sputum, and damage to the lungs, including emphysema and chronic bronchitis." http://en.wikipedia.org/wiki/Health_effects_of_tobacco (Mar. 14, 2012).

claimant explained that she could not quit smoking because treatment was unavailable or too expensive.

Moreover, under 20 C.F.R. § 404.1530, "[i]n order to get benefits, [a claimant] must follow treatment prescribed by [his or her] physician if this treatment can restore [the claimant's] ability to work" and failure to do so, without a good reason, will result in the denial of benefits.  Under the facts of this case, Howell failed to follow treatment prescribed by her doctor, that included counseling to stop smoking.

The Court concludes the ALJ properly considered Howell's credibility with respect to her respiratory condition, that he gave specific reasons for his findings, and that his findings were well supported by objective medical evidence in the record.  In addition, the ALJ's findings made clear to Howell and subsequent reviewers that he gave little weight to Howell's contentions that her respiratory condition rendered her unable to work.  The Court concludes the ALJ committed no error and that the credibility findings were supported by substantial evidence.

> **B.**     **Development of Record**

> ### *1.*     *Adequate Record with respect to Asthma/COPD*

It is well-established that the ALJ has a duty to develop an adequate record during a disability hearing consistent with the issues raised.  Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993).

> The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised. This is true despite the presence of counsel, although the duty is heightened when the claimant is unrepresented. The duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and learns the claimant's own version of those facts.

Id.  This responsibility to develop the record may require the ALJ to order a consultative examination.  *See* Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).

Where, as here, Howell was represented by counsel, the ALJ may usually rely on counsel to adequately present the evidence, and "to identify the issue or issues requiring further development." *See, e.g.,* Branum v. Barnhart, 385 F.3d 1268, 1271 (10th Cir. 2004) (quotations omitted).  *See also* Maes v. Astrue, 522 F.3d 1093, 1097 (10th Cir. 2008) ("Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation.").

Howell did not explain exactly how the ALJ purportedly failed to properly develop the record with respect to her respiratory problems.  Instead, counsel stated "***if*** the ALJ found that the record was not clear as to the extent and severity of Ms. Howell's respiratory problems a credibility determination is no substitute for the duty that the ALJ has to fully develop the record." [Doc. 18, at 6] (emphasis added).  While the argument is valid, the premise is not.  Howell's attorney surmised that the ALJ found the record not clear as to Howell's respiratory condition.  The Court finds no support in the ALJ's decision for the argument.

First, the ALJ did not state that he found the record unclear as to the extent and severity of Howell's respiratory condition.  Second, the Court explained above that the ALJ's credibility findings regarding Howell's respiratory problems were thorough, supported by substantial evidence, and not erroneous.

Moreover, Howell's hearing attorney[22] failed to raise concerns that the record was incomplete as to documentation or testing of Howell's respiratory condition.  *See, e.g.,* [AR 246,

_____

[22]A different attorney represented Howell during the administrative proceedings and hearing.

397.] While one of the attorney's letters or briefs to the ALJ mentions her respiratory condition, the attorney emphasized other impairments over the respiratory problems. [AR 246-248.] In addition, the attorney argued that Howell's respiratory problems "requir[ed] emergency room visits" "throughout 2008," but that is incorrect. [AR 246.] As stated *supra,* in 2008, medical records indicate Howell went to the hospital on three occasions. During one visit, the notes state Howell was there for back pain and seizures, although she was also given Advair. [AR 354.] On May 11, 2008, she went to the hospital related to breathing problems and had run out of Albuterol. [AR 350.] On the last visit to the hospital in 2008, Howell was treated primarily for back pain. The November 2008 record indicates that no respiratory distress was observed and her lungs were clear. [AR 359-60.] The ALJ relied on the normal chest x-ray findings from that period of time. [AR 368.]

In deciding whether an ALJ properly and adequately developed the record, the Tenth Circuit noted the following:

> [T]he more important inquiry is whether [sufficient questions were asked during the hearing] to ascertain (1) the nature of a claimant's alleged impairments, (2) what on-going treatment and medication the claimant is receiving, and (3) the impact of the alleged impairment on a claimant's daily routine and activities.

Thompson v. Sullivan, 987 F.2d 1482, 1492 (10th Cir. 1993) (internal citation omitted). Howell's attorney did not identify any specific failure by the ALJ to develop the record during the one-hour hearing. The ALJ and Howell's attorneys made inquiries into all of the above-described areas, and the record provides ample information regarding these inquiries.

Moreover, Howell's attorney did not request additional time to obtain medical records (that was not granted) and did not request examinations with respect to Howell's respiratory problems. Nor did he seek any other development of the record be undertaken.

32

The Court finds the ALJ committed no error with respect to development of the record as to Howell's respiratory problems.

### 2.   *Listing § 3.03B ("asthma with attacks")*

Howell also asserts that the ALJ should have considered listing 3.03B ("asthma with attacks") rather than only listing 3.03A[23] ("asthma with chronic asthmatic bronchitis"), which analysis he claims was "fraught with error."  It is not clear whether Howell's attorney challenges the ALJ's findings at step three that Howell's respiratory impairments did not meet or equal listing 3.03A or some other listing, or whether his argument is limited to the position that the ALJ failed to develop the record with respect to listing 3.03B.  Because Howell does not expressly challenge the ALJ's step three findings, the Court considers this part of Howell's argument that the ALJ failed to properly develop the records, specific to listing requirements of 3.03B.

Howell asserts that "first and foremost," the number of times Howell sought physician intervention for her respiratory issues "with steroids and/or antibiotic [sic] should have triggered an analysis" under Listing 3.03B.  This listing provides:

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year.  Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

Under §3.00C, asthma attacks or exacerbations are evaluated in terms of frequency and intensity of episodes that occur despite prescribed treatment.

> Documentation for these exacerbations should include available hospital, emergency facility and/or physician records indicating the

---

[23]Listing 3.03A instructs that its evaluation is to be conducted under the criteria for chronic obstructive pulmonary disease in 3.02A.  20 C.F.R. Part 404, Subpart P, App. 1, § 3.03A.

> dates of treatment; clinical and laboratory findings on presentation, such as the results of spirometry and arterial blood gas studies (ABGs); the treatment administered; the time period required for treatment; and the clinical response.  Attacks of asthma, episodes of bronchitis or pneumonia or hemoptysis . . ., or respiratory failure. . . are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting.

20 C.F.R. Part 404, Subpart P, App. 1, § 3.00C.

First, there is no evidence that Howell was ever hospitalized for treatment of her respiratory problems.  The few visits she made to the hospital did not always relate to an asthma attack, and none of the hospital visits resulted in an admission.  Second, while true that Howell visited her physician on many occasions from 2007-2009,[24] and was prescribed Prednisone on some occasions and an antibiotic on other occasions, it is also true that she was not prescribed those medications on many other medical visits.[25]  *See, e.g.,* [AR 331, 330, 333, 336, 350, 354, 357, 378, 380, 387, 388, 390, 392, 437, 438, 439, 442, 443, 444.]

In addition, there are no clinical and laboratory findings regarding Howell's respiratory problems, such as spirometry and arterial blood gas studies.  None of the medical records that are legible indicate Howell has "asthma attacks," although they do reference acute bronchitis, asthma,

---

[24]Howell repeatedly mentions 17 doctor's visits between 2007 and 2009, although many of those visits did not concern solely respiratory ailments. [*See, e.g.,* AR 339 (thinks she has seizures; complaints of back pain); AR 340 (there to establish care and appeared to have cold by symptoms); AR 374 (mid back pain; requesting pain medications); AR 375 (pain in both shoulders); AR 387 (f/u on CT scan results; complaints of headaches); AR 381 (neck pain due to displaced discs); AR 382 (report of miscarriage); AR 440 (muscle cramps and pain on abdomen and hands); AR 439 (low back pain); AR 443 (also requesting birth control pills); AR 447 (also complains of low back pain); AR 449 (vomiting, sore throat, complaints of right shoulder, mid-back and lower back pain); AR 451 (headache and complaints of low back pain).]

[25]The doctor's handwriting is not always legible.

and COPD.  Only Howell used the phrase "asthma attacks" in a disability services questionnaire. [AR 182.] Howell's statement on the asthma history form that she had asthma attacks every 20 minutes, lasting 20 minutes to an hour are not reflected in the medical records.

For all of these reasons, the Court finds no substantial evidence in the administrative record that would have triggered the ALJ's duty to further develop the record.

### 3. *Consultative Examination*

Howell also argues that the ALJ should have ordered a consultative examination, especially where the medical record did not contain the respiratory tests required by listing 3.03A/3.02A.  The Commissioner "has broad latitude in ordering consultative examinations."  Hawkins, 113 F.3d at 1166.  In Hawkins, the Court identified three instances when a consultative examination is often required:  "where there is a direct conflict in the medical evidence"; "where the medical evidence in the record is inconclusive"; and "where additional tests are required to explain a diagnosis already contained in the record."  Id.

The Court does not find a direct conflict in the medical evidence, that the medical evidence of record was inconclusive, or that additional tests not ordered by physicians, after multiple doctor's visits, were required to explain a diagnosis.  The Court determines that sufficient evidence exists in the administrative record for the ALJ's disability determinations.  Thus, the Court will not disturb the ALJ's broad latitude in not ordering a consultative examination.  The Court further observes that Howell's attorney could have requested a consultative examination but did not.  *See, e.g.,* Barrett v. Astrue, 340 F. App'x 481, 486 (10th Cir. Aug. 6, 2009) (unpublished)[26] (claimant argued ALJ

---

[26]Unpublished opinions are not binding on the Court.  However, they may provide persuasive value.

should have ordered consultative examination after counsel requested the examination before hearing was conducted).

Finally, Howell claims that the ALJ committed error in his consideration of listing 3.03A, and again argues that the ALJ had a duty to obtain a consultative examination when "as here the medical evidence is not clear as to a given impairment." [Doc. 18, at 7.] The Court already discussed why it found the ALJ had no duty to obtain a consultative examination where there was sufficient evidence of record to make the disability determinations.  The Court concludes the ALJ committed no error with respect to requesting a consultative examination or in his analysis of listing 3.03A.

### C.    Step Five Findings

Howell argues that the ALJ's step five findings were unsupported by substantial evidence where the VE testimony conflicts with the Dictionary of Occupational Titles.  Howell further contends that the ALJ's step five findings that Howell could return to other jobs were unsupported.

At step five, the ALJ has the burden to show there are jobs in the regional or national economies that the claimant can perform with the limitations found by the ALJ.  Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).  In addition, at step five, the ALJ "must investigate and elicit a reasonable explanation for any conflict between the [DOT] and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence support a determination of non disability."  Id. at 1091.

At the ALJ hearing in this case, the VE testified, based on the demands of Howell's past relevant work and the ALJ's hypothetical [AR 63-64], that Howell could not perform her past relevant work. [AR 64.]

The ALJ presented the following hypothetical to the VE:

[A]ssume . . . we have a person of the same age, education, past work experience as [Howell].  I[] would like you to assume this is a right-handed person, right hand dominant.  I'd like you to assume this individual can only work at the light exertional level, that is to say could occasionally lift . . . and carry 20 pounds but frequently only ten pounds.  That person could stand and walk up to six hours in a normal work day with normal breaks and sit for up to six hours.  That this individual can never climb ladders, ropes, or scaffolding but could occasionally climb ramps and stairs, could occasionally stoop, crouch, and twist at the neck to the left side occasionally, could frequently balance and kneel.  Due to the impairments, this person can only occasionally reach with the right arm overhead.  Due to the impairments this individual cannot have any jobs which expose[] her to temperature extremes such as hot or cold temperatures, cannot work in places with excessive gases, fumes, dust, smoke, odors, chemicals, or poor ventilation.  Due to impairments, mental type impairments, this individual can only lend attention and concentration in the work place for two hours at a time.  That is to say could do it for two hours, would need a short break, come back and do two hours, short break, throughout the day like that.  The short breaks could coincide with the normal breaks during the day.  This person can understand[,] carry on and remember only simple one, two, or three step routine, repetitive tasks.  This individual has a fair ability, fair being defined as limited but satisfactory ability[,] to deal with changes in the work place, to relate to coworkers, and to interact with supervisors.

[AR 63-64.]  Based on this hypothetical, the VE testified that Howell could perform the job of office helper, with the DOT code of 239.567-010.  The job had a light exertion level, with SVP of 2, which made it unskilled.  It did not require a lot of interaction with coworkers although there was still some contact "but not necessarily interaction."  The VE testified that the position was in an office and thus, there was limited interaction. [AR 65.]

The VE found that cashier type positions would fit within these restrictions as well.  The cashier DOT code was 211.462-010, and such work was classified at the light unskilled level. [AR 65- 66.]  The VE also testified that Howell could perform the job of survey worker, DOT code 205.367-054, which was light, unskilled work. [AR 66.]

37

The ALJ determined that the VE's testimony supported the conclusion that Howell could perform the positions of office helper, cashier, and survey worker (based on the limitations presented).  Moreover, the ALJ concluded that the VE's testimony was consistent with information in the DOT. [AR 22.]

### 1.      *Interaction with Others*

Howell first raises a challenge to the DOT work function rating for the specified jobs vs. the limitations expressed by the ALJ to the VE. [Doc. 18, at 9.] She claims that the ALJ expressly limited her to performing jobs that required little interaction with co-workers and the public. According to Howell, a review of the job descriptions of office helper, cashier, and survey worker indicates a "significant"[27] component of interacting with people in one category: "People: 6[28] - Speaking-Signaling."  Thus, according to Howell, the DOT descriptions conflict with Howell's limitations or the VE's testimony.

The Court rejects this argument.  The DOT defines "speaking/signaling" as "[t]alking with and/or signaling people to convey or exchange information. Includes giving assignments and/or directions to helpers or assistants."  The DOT describes each of the above jobs as requiring a level 6 ability to function in relation to people. "This is nearly the lowest rating possible for interacting with people, on a scale of one to eight in which zero requires mentoring, one negotiating, two

---

[27]The Court is not clear whether the DOT rates the job of office helper as involving a "significant" or "not significant" component of interacting with people at the level "6."  In Smith v. Astrue, 2011 WL 6749803, at *3 (E.D. Cal. Dec. 22, 2011) (unpublished), the Court noted that the people function (for office helper) was "not significant." (*citing* DOT 239.567–010, 1991 WL 672232). However, a cashier, 211.462-010 and a survey worker, 205.367-054 do rate the job description as involving a "significant" component of interaction.  1991 WL 671840, 1991 WL 671725.

[28]The three positions identified by the VE – DOT code numbers 239.567-010, 211.462-010, and 205.367-054, all contain the number "6" as the fifth digit.  This digit reflects the job's relationship to people.  A number of 5, in contrast, reflects the job's relationship to data.  Dictionary of Occupational Titles, Appendix B, p. 1005 (4th Ed. Rev. 1991).

instructing, three supervising, four diverting, five persuading, six speaking/signaling, seven serving

and eight taking instructions-helping."  Southwick v. Astrue, 2009 WL 1930173, at *3 (D. Or. June

30, 2009) (unpublished) (*citing* DOT, Appendix B).

Upon consultative examination, Dr. Sachs did not find any limitations with respect to

Howell's ability to interact with people or co-workers. [AR 307-09.]  He stated that it appeared that

most of Howell's difficulties, "at least with respect to her employability, relate to her physical issues

. . . ." [AR 309.] Dr. Gabaldon found that Howell was not significantly limited in her ability to work

in coordination or proximity with others without being distracted or in her ability to interact

appropriately with the general public. [AR 311, 312.] She was only moderately limited in her ability

to get along with coworkers or peers without distracting them, and was not significantly limited in

her ability to maintain socially appropriate behavior in the workplace. [AR 312.] Howell was

"social" and able to interact "adequately with co-workers and supervisors." [AR 313.]  She had mild

limitations in maintaining social functioning. [AR 259.]

The Court finds that substantial evidence supports the ALJ's findings and his reliance on the

VE's testimony, and, furthermore, that there is no evidence of conflict between the VE's testimony

and the DOT that would require remand.

### 2.  *Mental Demands of Positions*

Howell argues that the VE's testimony was inconsistent with the DOT regarding the

"reasoning development" and mathematical skills[29] required for the three positions.  As noted by

Howell, the reasoning development code for each job is found immediately following the specific

job description in the DOT.  It is coded as "R" and then is modified by the addition of a number

---

[29]Howell presented no additional argument specific to requirements for or abilities in
"mathematical skills."  Thus, the Court does not address it.

ranging from 1 to 6, with R1 jobs requiring the least reasoning skills and R6 jobs requiring the most

skill. [Doc. 18, at 9-10.]

The survey worker and cashier positions both require an "R3." The officer worker position

is rated "R2." The DOT defines the reasoning development required for a position rated R2 as:

> Apply commonsense understanding to carry out detailed but
> uninvolved written or oral instructions. Deal with problems
> involving a few concrete variables in or from standardized situations.

DOT, Appendix C, p. 1101. The reasoning development required for R3 is:

> Apply commonsense understanding to carry out instructions
> furnished in written, oral, or diagrammatic form. Deal with problems
> involving several concrete variable in or from standardized situations.

Id. Howell argues that the ALJ's limitation of Howell's ability to perform only "simple tasks" is

more consistent with positions requiring "R1" reasoning development rather than positions with R2

or R3 requirements.

Howell did not fully describe the ALJ's limitations. The ALJ limited Howell to

"understanding, carrying out, and remembering simple, route, and repetitive one to three step tasks."

[AR 19.] Although courts have not frequently addressed challenges similar to the one Howell raises

here, there are decisions affirming an ALJ's decision and finding no error when a VE testifies that

a claimant, restricted to routine or simple work, could do positions with R2 or R3 ratings. *See, e.g.,*

Stern v. Commissioner of Social Sec., 2011 WL 6780889, at *6 (N.D. Ohio, Nov. 23, 2011)

(unpublished) (claimant limited to performing simple tasks would not rule out positions with R2 and

R3 reasoning development) *report and recommendation adopted,* 2011 WL 6780883 (N.D. Ohio

Dec 27, 2011); Hackett v. Barnhart, 395 F.3d 1168, 1176 (11th Cir. 2005) ("level-two reasoning

appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); Money v.

Barnhart, 91 F. App'x 210, 214–15 (3d Cir. 2004) (unpublished) ("Working at reasoning level 2

would not contradict the mandate that her work be simple, routine and repetitive"); Hillier v. SSA, 486 F.3d 359 (8th Cir. 2007) (concluding plaintiff could perform the position of cashier, a level three reasoning job, even though ALJ limited plaintiff to positions where she could "understand, remember, and follow simple, concrete instructions"). *See also* Gibson v. Astrue, 2010 WL 3655857, at *14-15 (N.D. Ga. Sept. 13, 2010) (unpublished) (finding no error that claimant could perform R2 reasoning jobs when limited by ALJ to performing simple, routine, repetitive, non-detailed tasks).

Here, the consultative physician placed no mental restrictions on Howell. [AR 309.] The disability physician found that Howell was not significantly limited in her ability to understand and remember very short and simple instructions and only moderately limited in her ability to understand and remember detailed instructions. [AR 311-313.]

In addition, the ALJ fulfilled his duty in inquiring of the VE as to whether there was a conflict between the VE's testimony and the DOT. The VE responded there was no conflict. [AR 67.] Howell was represented by counsel during the hearing and yet, counsel never raised any possible conflicts between VE testimony and the DOT, nor questioned the ALJ about any such conflicts. *See, e.g.,* Gibson, 2010 WL 3655857, at *15 (observing cases holding that "ALJ need not independently corroborate the VE's testimony and should be able to rely on such testimony where no apparent conflict exists with the DOT") (internal citation omitted).

For all these reasons, the Court rejects these arguments by Howell as to possible conflict between the VE's testimony and the DOT definitions. The Court concludes that the VE's testimony along with the evidence of record provides substantial support for the ALJ's decision and that the ALJ committed no error requiring remand.

## VI.    <u>CONCLUSION</u>

For all of the above-stated reasons, the Court denies Howell's motion for reversal or remand [Doc. 17] and dismisses this matter with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge